CALVIN MANNING, Guardian, Appellee, v. JOHN H. SPRY, Treasurer of Wapello County, AND WAPELLO COUNTY, Appellants.

Taxation: PENSION MONEY: EXEMPTION OF: INSANE PENSIONER. Pension money in the hands of a guardian of an insane pensioner is exempt from taxation, even though in the form of interest bearing loans. The guardian is regarded as the agent of the government, and so long as the fund remains in his hands it is in transmission to the pensioner and under federal control.

*Appeal from Wapello District Court.*—HON. T. M. FEE, Judge.

SATURDAY, OCTOBER 10, 1903.

SUIT in equity to restrain the defendant treasurer from collecting a tax assessed against plaintiff, as guardian of one John Schwabkey, insane, on property held by him as such guardian, on the ground that the property was and is exempt from taxation. Defendants filed a demurrer to the petition, which was overruled, and, electing to stand on their demurrer, a decree was entered as prayed, and defendants appeal.—*Affirmed.*

*D. H. Emery*, County Attorney, and *A. W. Enoch* for appellant.

*Mitchell & Hunter* and *S. E. Adler* for appellee.

DEEMER, J.—The controlling facts, as gathered from the petition, are as follows: In the year 1839 one Blake was appointed guardian of the person and property of

John Schwabkey, insane. He continued to act as such guardian until his death, in March of the year 1897. Thereupon plaintiff was appointed in his stead. The assessor of the city of Ottumwa, in Wapello county, listed and assessed against plaintiff money and credits to the amount of $4,500, and the board of supervisors levied taxes thereon amounting to over $300, which were regularly entered on the taxbooks of the county. In January of the year 1901 the defendant Spry, as county treasurer, entered on the taxbooks of the county taxes against plaintiff, on moneys and credits held by him during the years 1895, 1896, 1897, 1898, and 1899, amounting in all to something like $1,700. Quoting now from the petition: "(4) That the moneys so assessed, and on account of which said levies were made, were and are moneys paid to this plaintiff as guardian of said John Schwabkey, and to his predecessor in the guardianship, by the United States government, as a pension to said John Schwabkey, under the general pension laws of the United States, for and on account of physical disabilities received and sustained by the said John Schwabkey while a soldier in the regular army of the United States during the war of the Rebellion, and credits on which assessments were made and are made, and on account of which such levies were made, were and are promissory notes taken and held by plaintiff for money loaned by him, the money so loaned being received by him, and his predecessor in guardianship from the United States government on account of the pension allowed his ward as aforesaid. (5) That the United States government first allowed said John Schwabkey a pension on or about the 9th day of March, 1889, and on or about that time paid plaintiff's predecessor, as back and accrued pension due plaintiff's ward, $3,752. Afterwards, and on or about the 27th day of May, 1890, the government increased the rating of plaintiff's ward to $72 per month, and for him, on or about said time, paid to plaintiff's predecessor the sum of $11,244

as back and accrued pension due plaintiff's ward; and
ever since said time plaintiff's predecessor and himself
have received from the government $216 per quarter as
pension from the government to their ward.    That during
all of the said time the said John Schwabkey has been
insane and utterly helpless, and the expenses of his keep,
care, attention, and medical attention, and the expenses
of his guardianship, have largely exceeded any interest
income that either the plaintiff's predecessor or himself
could or have derived upon or from the aforesaid pension
money by loaning out the same.    That no part of the
moneys have been used productively, other than being
loaned out at interest, and the moneys and credits held
now by plaintiff aggregate much less than the principal
amount he and his predecessors have directly received
from the government to their said ward; and their said
ward does not now own, and has not owned since long
prior to his being placed under guardianship, any money,
property, or other valuable thing whatsoever, except the
pension money received from the government, and prom-
issory obligations taken for it when loaned out."

Plaintiff claims that these tax levies were each and
all illegal and void, in that the moneys and credits were
and are exempt from taxation under section 4747 of the
Revised Statutes of the United States [U. S. Comp. St. 1901,
page 3279]. He also pleads that the state has no power to
tax pension money, or the immediate avails thereof; that
such property is exempt from taxation under the laws of the
United States and the Constitution and statutes of this
state; and that taxes levied under state laws upon
pension moneys in the hands of a pensioner, and received
by him, under the laws of the United States government
as a bounty on account of disabilities he received in the
military service of the government, are in contravention
of the soverenity of the United States government under

the Constitution, in that they impair and burden the power of the government to reward for military or naval service by bounty or pension. The demurrer, of course, challenges each and all of these legal propositions, but admits the facts; hence we have to deal simply with the questions of law presented.

Section 4747 of the Revised Statutes, relied upon by the plaintiff, reads as follows: "No sum of money due or about to become due to any pensioner shall be liable to attachment, levy, or seizure by or under any legal or equitable process whatever, whether the same remains with the pension office, or any officer or agent thereof, or is in the course of transmission to the pensioner entitled thereto, but shall inure wholly to the benefit of such pensioner." And section 1309 of our Code reads in this wise: "The term credit as used in this chapter includes every claim or demand due or to become due for money * * * and all money or property secured by deed * * * mortgage or otherwise, but pensioners of the United States or any of them, or salaries or payments expected for services to be rendered are not included in the above term." Construing these sections together, it is manifest that pension money is exempt, not only from execution, but also from taxation, so long as it remains in the shape of money to meet the daily wants and necessities of the pensioner. This must be so, else it would not inure wholly to the benefit of the pensioner. Moreover, when we consider the nature and object of this bounty, it is clear to our minds that, were there no statute expressly exempting such funds, they should not be held subject to taxation. There is an old phrase to the effect that "the power to tax is the power to destroy." There are, perhaps, some limitations of this doctrine, which would materially modify or explain it, but for present purposes it must be accepted as a truism. A pension is a mere bounty or gratuity given by the government in consider-

ation or recognition of meritorious past services rendered
by the pensioner or by some kinsman or ancestor.   The
policy of granting the same has prevailed both here and in
the mother country from a very early period, and no bur-
den has been more easily borne or zealously guarded than
this.   The first Continental Congress, by act of August
26, 1776, provided for pensions for soldiers and sailors serv-
ing in the Revolutionary War; and one of the earliest acts
of the Congress was a pension bill passed September 29,
1789.   1 Stat. 95, chapter 24.   Since that time a large
number of general and special acts have been passed, and
the government has been extremely liberal with those
who have served it in time of need.   The Constitution
does not confer express power on Congress to pass such bills,
but the right has been exercised under the grant of power
to raise and support armies.   As we view it, the power to
grant pensions and bounties is inherent in government
and its exercise is demanded not only from the standpoint
of policy, but from the higher considerations of gratitude
and patriotism.   The function has been assumed by the
general government, and the matter is exclusively of fed-
eral cognizance, and beyond the pale of state control.
The entire matter is vested in the Congress, and that body
has created a bureau, and passed various acts with refer-
ence to the granting and control of pensions, which are
complete and comprehensive.   Not only has it been liberal
in its allowance of pensions, but it has undertaken to
guard and control them so that they shall inure wholly to
the benefit of the pensioner.   Courts are not agreed as to
just when the federal government loses control, and the
state may take it; but we have held, in construing section
4747 of the Revised Statutes, before quoted, that property
purchased with pension money is exempt from levy and
sale under execution.   *Crow v. Brown*, 81 Iowa, 344.
This is a step in advance of most other jurisdictions.   The
rule generally is that such money is not exempt after it

has reached the pensioner. See cases cited in *Holmes v. Tallada*, 3 L. R. A., at page 219, note, and *McIntosh v. Aubrey*, 22 Sup. Ct. Rep. 561 (46 L. Ed. 834). We quote the *Crow Case* simply to show the liberal construction we have placed on this statute. Aside from this, if the state were permitted to tax pension money, it could virtually destroy any bounty the government might see fit to bestow on its soldiers and sailors, and the guaranty that it should inure wholly to the benefit of the pensioner would be wholly destroyed.

If the pensioner in this case had been *sui juris*, and had held in his possession pension money received from the government, we do not think such fund would have been subject to assessment for taxation. Indeed, section 1309 expressly exempts it. Had he, instead of holding the money, loaned it out, and taken bonds or mortgages as security, it may be the state would have had power to tax these securities. But we do not decide that question. Adherence to the doctrine of *Crow v. Brown Case* would result in a holding that such property could not be reached by legal process, for it would not inure wholly to the benefit of the pensioner. And if this be true, it would doubtless follow, as a necessary corollary, that it could not be taxed, for the reason that no writ could issue for its sequestration. But we need not speculate on this phase of the case, for there are other considerations which, to our minds are decisive of it. As the pensioner was laboring under a disability, he has never received this pension money, unless it be held that payment to his guardian was payment to him, and that he has had the full benefit thereof. As this matter of pensions is regulated wholly by the federal government, we must look to the acts of Congress, to determine the authority of a guardian with respect to pension money.

Section 4766 of the Revised Statutes of the United States reads as follows: "Hereafter no pension shall

be paid to any person other than the pensioner entitled thereto, nor otherwise than according to the provisions of this title; and no warrant, power of attorney, or other paper executed or purporting to be executed by any pensioner to any attorney, claim agent, broker or any persons shall be recognized by any agent for the payment of pensions; nor shall any pension be paid thereon, but the payment to persons laboring under legal disabilities may be made to the guardians of such persons in the manner herein prescribed and pensions payable to persons in foreign countries may be according to the provisions of existing laws; provided, that in case of an insane invalid pensioner having no guardian, but having a wife or children dependent upon him, (the wife being a woman of good character) the commissioner of pensions is hereby authorized, in his discretion, to cause the pension to be paid to the wife upon her properly executed voucher, or, in case there is no wife, to the guardian of the children, upon the properly executed voucher of such guardian, and in like manner to cause the pension of invalid pensioners who are or may hereafter be imprisoned as punishment for offenses against the laws, to be paid while so imprisoned to their wives or the guardians of their children."

And the penal laws relating to embezzlement of pension money are copied below:

"Sec. 4783. Every guardian having charge and custody of the pension of his ward who embezzles the same in violation of his trust or fraudulently converts the same to his own use, shall be punished by fine not exceeding two thousand dollars, or imprisonment at hard labor for a term not exceeding five years, or both."

"Sec. 5486. If any guardian having the charge and custody of the pensions of his ward shall embezzle the same in violation of his trust, or fraudulently convert the same to his own use, he shall be punished by a fine not exceeding two thousand dollars or imprisonment at hard

'labor for a term not exceeding five years, or both, at the discretion of the court."

The above-mentioned section was amended on February 10, 1891, so as to read as follows:

"Every guardian, conservator, curator, committee, tutor, or other person having charge or custody in a fiduciary capacity of the pension of his ward, who shall embezzle the same in violation of his trust or fraudulently convert the same to his own use, shall be punished by a fine not exceeding two thousand dollars or imprisonment at hard labor for a term not exceeding five years, or both at the discretion of the court." Act Feb. 10, 1891 chapter 130, section 1, 26 Stat. 746. In reviewing these and kindred sections of the acts of Congress, the United States Supreme Court, in *U. S. v. Hall*, 98 U. S. 343 (25 L. Ed. 180), held that a guardian appointed under state authority, to whom pension money was paid, is nothing more than an agent for the government, and that money in his hands is still under its control and management. Indeed, guardians appointed under state laws are required to make report to the commissioner of pensions of their acts and doings with reference to pension money received by them. In the *Hall Case*, it is held that a guardian appointed under state authority is not bound to accept pension money, and that, if he does, he is amenable to the laws of Congress. This being so, it is clear, we think, that the money has not passed into the hands of the pensioner, although paid to his guardian, and by him loaned out for safekeeping, and to secure some return therefrom. So long as the fund remains subject to the control and jurisdiction of the federal government, the state has no right to impair, direct, or control it. It is doubtful if a guardain could be punished by the state courts for mismanagement of pension money. He is amenable to the general government, and in handling pension money he acts as a government official or agent, and not primarily

for the court appointing him.  The commissioner of pensions has held that pension funds in the hands of a guardian, which have not been paid to the pensioner or expended in his behalf in accordance with law, are in the nature of an accrued pension, and do not pass to his representatives upon his death, but are to be disposed of as provided in the act of Congress of June 30, 1890, reading as follows: "Provided further, that hereafter whenever a pension certificate shall have been issued and the pensioner mentioned therein dies before payment shall have been made, leaving no widow and no surviving minor children, the accrued pension due on said certificate to the date of the death of said pensioner may, in the discretion of Secretary of the Interior, be paid to the legal representatives of said pensioner."  Act June 30, 1890, chapter 639, section 1, 26 Stat. 187.  And of Act March 2, 1895, chapter 193, section 1, 28 Stat, 964 [U. S. Comp. St. 1901, page 3257], reading as follows:  "Such accrued pensions shall not be considered part of the assets of the estate of the deceased person nor be liable for the payment of the debts of said estate in any case whatsoever but shall inure to the sole and exclusive benefit of the widow or children.  And if no widow or child survive such pensioner and in the case of his last surviving child who was such minor at his death, and in case, of a dependent mother, father, sister or brother no payment whatsoever of the accrued pension shall be made or allowed except so much as may be necessary to reimburse the person who bore the expense of their last sickness and burial, if they did not leave sufficient assets to meet such expense.  And the mailing of a pension check, drawn by a pension agent in payment of a pension due to the address of a pensioner shall constitute payment in the event of the death of the pensioner subsequent to the execution of the voucher therefor."  This, it seems to us, is the result which logically follows from the *Hall Case.*  The

guardian does not receive the pension as of right. Indeed, as we understand it, the government may, and frequently does, withhold pensions from one under guardianship. If a guardian does receive it, he is amenable to the department for its care and disposition. This being true, it has not reached the beneficiary until actually paid to him or expended for his benefit. While in the guardian's hands, he is a mere trustee or depositary for the general government, and the fund, no matter what its form is not subject to taxation. In so far as the pensioner is concerned, it is still a pension, within the meaning of section 1309 of our Code.

Appellants' counsel present an ingenious argument in favor of the taxation of these credits, but it is wholly bottomed on the thought that when the money was paid to the guardian it was the same, in law, as a payment to the pensioner. If that were true, there would, of course, be much reason for saying that as he had loaned the money, and was not using or intending to use it for his ward's daily necessities, he should pay his proportion of the taxes for the protection afforded his property. Here lies the fallacy, as we view it. The money has not, under the rulings of the pension department, reached the pensioner. It is being held by the guardian as a trustee, and is in process of transmission until actually paid to the pensioner, or expended for his benefit. This being true, it is not subject to taxation.

The decree is right, and it is AFFIRMED.